USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 05, 2012

08-2462-cv(L)
Bessemer Trust Company, N.A. v. Branin

1    UNITED STATES COURT OF APPEALS

2    FOR THE SECOND CIRCUIT

1:02-cv-10276-JES

3    August Term, 2008

4    (Argued:  June 3, 2009       Decided:  April 5, 2012)

5    Docket Nos. 08-2462-cv(L), 08-2677-cv(XAP)

6    ------------------------------------

7    BESSEMER TRUST COMPANY, N.A.,

8    Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,

9    - v -

10   FRANCIS S. BRANIN, JR.,

11   Defendant-Counterclaimant-Appellant-Cross-Appellee.

12   ------------------------------------

13   Before:   McLAUGHLIN, CALABRESI, and SACK, Circuit Judges.

14         Appeal by the defendant and cross-appeal by the

15   plaintiff from a judgment of the United States District Court for

16   the Southern District of New York (John E. Sprizzo, Judge)

17   entered after a bench trial.  The district court found the

18   defendant liable to the plaintiff for improper solicitation of a

19   client's account under the so-called "Mohawk doctrine," where

20   that account and its associated "good will" had earlier been

21   transferred to the plaintiff by the defendant and others.  On

22   appeal, we certified a question to the New York Court of Appeals

23   as to the scope of the "Mohawk doctrine."  Bessemer Trust Co.,

24   N.A. v. Branin, 618 F.3d 76, 93-94 (2d Cir. 2010).  In answer to

25   our question, the Court of Appeals concluded, inter alia, that

1   "while a seller [of a business and its 'good will'] may not

2   contact his former clients directly [to seek to attract them to

3   his new firm], he may, in response to inquiries made on a former

4   client's own initiative, answer factual questions."  Bessemer

5   Trust Co., N.A. v. Branin, 16 N.Y.3d 549, 559-60, 949 N.E.2d 462,

6   470, 925 N.Y.S.2d 371, 379 (2011) (internal quotation marks

7   omitted).  In light of this response, we vacate the judgment of

8   the district court in part and remand for further proceedings.

9            Vacated in part, decision reserved in part, and

10  remanded.

11                          DONALD I. STRAUBER, Chadbourne & Parke
12                          LLP (Gretchen N. Werwaiss, Marjory T.
13                          Herold, and Bernadette K. Galiano, on
14                          the brief), New York, NY, for Plaintiff-
15                          Counter-Defendant-Appellee-Cross-
16                          Appellant.

17                          LOUIS P. DiLORENZO, Bond, Schoeneck &
18                          King PLLC (Michael I. Bernstein and
19                          Michael P. Collins, on the brief), New
20                          York, NY, for Defendant-Counterclaimant-
21                          Appellant-Cross-Appellee.

22  SACK, Circuit Judge:

23           We return to consider this appeal further, in light of

24  the answer provided by the New York Court of Appeals in Bessemer

25  Trust Co., N.A. v. Branin (Bessemer V), 16 N.Y.3d 549, 949 N.E.2d

26  462, 925 N.Y.S.2d 371 (2011), in response to a question that we

27  had certified to it in Bessemer Trust Co., N.A. v. Branin

28  (Bessemer IV), 618 F.3d 76, 93-94 (2d Cir. 2010).[1]  The issue to

---

[1] In "Bessemer I," the district court found defendant
Francis S. Branin, Jr., an investment portfolio manager, liable
to Bessemer, a firm to which he had sold "good will," after one

1    which the Court of Appeals gave its attention and to which we now

2    give ours concerns what actions the defendant, a seller of, inter

3    alia, the "good will"[2] of a business, may thereafter permissibly

4    take to woo former clients of the business to a competitor under

5    New York law.  The facts of this case and its procedural history

6    are set forth at some length in our previous opinion in this

7    appeal, Bessemer IV.  We recount them here only insofar as we

8    think it necessary to explain our disposition of this appeal in

9    light of the New York Court of Appeals' answer to our certified

10   question.

11                              **BACKGROUND**

12           On August 18, 2000, defendant Francis S. Branin, Jr.,

13   an investment portfolio manager and the largest shareholder of

14   the firm of Brundage, Story and Rose, LLC ("Brundage"), sold the

15   assets of the firm along with its client accounts and related

---

of Branin's former clients transferred his account from Bessemer
to Branin's new firm.  See Bessemer Trust Co., N.A. v. Branin
(Bessemer I), 427 F. Supp. 2d 386 (S.D.N.Y. 2006).  In "Bessemer
II," the district court granted Bessemer's motion for summary
judgment on Branin's counterclaims.  See Bessemer Trust Co., N.A.
v. Branin (Bessemer II), 498 F. Supp. 2d 632 (S.D.N.Y. 2007).  In
"Bessemer III," the district court fixed the amount of money for
which Branin was liable to Bessemer.  See Bessemer Trust Co.,
N.A. v. Branin (Bessemer III), 544 F. Supp. 2d 385 (S.D.N.Y.
2008).  In "Bessemer IV," inter alia, we certified a question to
the New York Court of Appeals.  See Bessemer Trust Co., N.A. v.
Branin (Bessemer IV), 618 F.3d 76 (2d Cir. 2010).  Finally, in
"Bessemer V," the New York Court of Appeals answered our
certified question.  See Bessemer Trust Co., N.A. v. Branin
(Bessemer V), 16 N.Y.3d 549, 949 N.E.2d 462, 925 N.Y.S.2d 371
(2011).

    [2]  We follow the New York Court of Appeals' style by placing
the term "good will" in quotation marks.  See, e.g., Bessemer V,
16 N.Y.3d 549, 949 N.E.2d 462, 925 N.Y.S.2d 371 passim.

1    "good will" to Bessemer.  Bessemer IV, 618 F.3d at 80-81.

2    Although Branin originally stayed on at Bessemer as a "client

3    account manager," he soon became dissatisfied with his diminished

4    responsibilities.  He left Bessemer to join Stein Roe Investment

5    Counsel LLC ("Stein Roe"), an investment management firm in

6    competition with Bessemer.  Id. at 81-82.

7          In negotiations with Stein Roe, Branin touted his

8    ability to bring his Bessemer clients, most or all of whom

9    originally moved with him as part of the sale of Brundage to

10   Bessemer, to Stein Roe.  He indicated "his hope that within

11   twelve months of joining the firm[,] he would be able to transfer

12   [to Stein Roe] $1.5 to $1.8 million of the approximately $2.3

13   million in [annual] revenue that he was [then] generating for

14   Bessemer."  Id. at 82.  "He informed Stein Roe that it was

15   possible, however, that few or none of his Bessemer clients would

16   move their business."  Id.  "Prior to his resignation from

17   Bessemer, Branin refrained from contacting any of his Bessemer

18   clients to inform them of his impending move" or to discuss

19   anything relating to it.  Id.

20         Once Branin joined Stein Roe, that company began

21   crafting and implementing a strategy to entice Branin's former

22   Bessemer clients to move their business to Stein Roe.  Id.  Part

23   of this strategy involved maintaining Branin's current schedule

24   of fees so that clients would not have their fees increased if

25   they followed Branin to Stein Roe.  Id.  Additionally, Branin's

26   former assistant at Bessemer, who was otherwise of no interest to

4

1   Stein Roe as a prospective employee, was hired by the firm "to

2   help Branin transition as much of his client base to Stein Roe as

3   possible."  Id. at 84 (brackets and internal quotation marks

4   omitted).  "By the following summer, around thirty of Branin's

5   former clients, representing $205 million in assets, had

6   transferred their accounts from Bessemer to Stein Roe, accounting

7   for all but around $23 million of the assets Branin [had] managed

8   at Stein Roe."  Id. at 82.

9         Branin did not initiate contacts with his clients in an

10   effort to assist Stein Roe in its strategy to obtain the Bessemer

11   clients.  Id.  He did, however, respond to their inquiries if

12   they asked why he left Bessemer.  Id.  If they requested

13   information about his new firm, he sent them Stein Roe's

14   promotional material.  Id.  The district court found that

15   "Branin's 'standard' answer to clients who asked why he left

16   Bessemer was that 'a firm like Stein Roe was far more appropriate

17   for me, . . . that the method of dealing with clients, that the

18   approach whereby portfolio managers managed the client portfolios

19   and interacted directly with the clients was more . . .

20   appropriate for my training and experience of 30 years in the

21   business.'"  Id. (quoting Bessemer Trust Co., N.A. v. Branin

22   (Bessemer I), 427 F. Supp. 2d 386, 391 (S.D.N.Y. 2006), in turn

23   quoting Joint Statement of Undisputed Facts, Ex. A to Pre-Trial

24   Order dated August 3, 2004) (ellipses in Bessemer I).  "Branin

25   did not say or suggest that Stein Roe's approach would be better

26   or more appropriate for any particular client, nor is there

1   [record] evidence that Branin explicitly disparaged Bessemer."

2   Id.

3         "The evidence introduced at trial established that

4   Branin had individual meetings, either alone or with other Stein

5   Roe employees participating," with, among others, representatives

6   of the Palmer family, a former client with a large account at

7   Brundage and then at Bessemer.  Id. at 82-83.  Branin had managed

8   the Palmer account for fifteen to twenty years at Brundage,

9   developing a close personal friendship with Carleton Palmer, III,

10  who represented the family in its dealings with Bessemer.  Id. at

11  83.  Branin did not notify Palmer and the Palmer family of his

12  move to Stein Roe.  Id.  But Palmer did call Branin and ask him

13  questions about the move.  Id.  Branin's responses were,

14  according to Palmer's testimony, very spare.  Id.

15        "Palmer followed up [on his inquiries] with a letter

16  requesting specific information as to how the Palmer account

17  might be handled at Stein Roe."  Id.  Palmer and other members of

18  the Palmer family then scheduled back-to-back meetings on August

19  29, 2002 with Stein Roe and Bessemer to discuss the Palmer

20  account.  Id.

21        Branin helped Stein Roe prepare for these meetings by

22  telling other Stein Roe employees about Carleton Palmer and the

23  Palmers' investment philosophy.  Id.  According to the trial

24  testimony of Carleton Palmer, during the subsequent meeting

25  between Palmer and Stein Roe, Branin "pretty much sat over in the

26  corner and kept quiet," and "played almost no role," "other than

6

1   to introduce Carleton Palmer to the firm and occasionally amplify

2   a point if he knew it was something [the Palmers] would be

3   interested in."  Id. (internal quotation marks and citations

4   omitted).

5        The Palmers thereafter invited Branin to Ohio to make a

6   specific proposal on behalf of Stein Roe.  Id.  Branin accepted.

7   Id.  During the subsequent visit, "Branin informed the Palmer

8   family that they would pay the same fees at Stein Roe that they

9   were then paying at Bessemer, and that the president of Stein Roe

10  would be the 'number two' on the family account."  Id.

11       "The next day, . . . September 17, 2002, the Palmer

12  family moved their account to Stein Roe."  Id.

13                  District Court Proceedings

14       On November 22, 2002, following the departure of the

15  Palmer family and several of Branin's other former Bessemer

16  clients from the firm, Bessemer filed the complaint in this

17  action in New York Supreme Court, New York County.  Id. at 84.

18  "Bessemer asserted claims for breach of contract and breach of

19  Branin's duty of loyalty to Bessemer based on Branin's allegedly

20  improper solicitation of clients and impairment of the [']good

21  will['] which Branin had sold to Bessemer in connection with the

22  sale of Brundage."  Id.  Branin removed the case to the United

23  States District Court for the Southern District of New York based

24  on diversity of citizenship, and filed various counterclaims.

25  Id.

1          The district court denied the parties' cross-motions

2     for summary judgment on Bessemer's claims, and the case proceeded

3     to a bench trial as to liability.  Id.  The district court issued

4     a memorandum opinion and order on April 10, 2006, concluding that

5     Branin had violated New York law by impairing Bessemer's "good

6     will" in the Palmer account, but that Bessemer had not proven a

7     violation of law by a preponderance of the evidence with respect

8     to any other transferred account.  Bessemer I, 427 F. Supp. 2d at

9     397-98.  The district court then conducted a separate bench trial

10    on damages, and concluded that Branin was liable to Bessemer in

11    the amount of $826,335 plus prejudgment interest of $402,838, for

12    a total of $1,229,173.  Bessemer III, 544 F. Supp. 2d at 390-93.[3]

13                    Proceedings in this Court

14          Branin appealed the finding of liability and damages.

15    With respect to the district court's finding of liability as to

16    the Palmer account, we determined that New York law regarding the

17    liability of a seller of "good will" for soliciting former

18    clients -- the so-called "Mohawk Doctrine," named after Mohawk

19    Maintenance Co. v. Kessler, 52 N.Y.2d 276, 419 N.E.2d 324, 437

20    N.Y.S.2d 646 (1981) -- was unclear as applied to the facts of

21    this case.  Bessemer IV, 618 F.3d at 90.  We therefore certified

22    the following question to the New York Court of Appeals:

23                 What degree of participation in a new
24                 employer's solicitation of a former

---

        [3] The district court also granted Bessemer summary judgment
on Branin's counterclaims, Bessemer II, 498 F. Supp. 2d at 639,
which we affirmed on appeal, Bessemer IV, 618 F.3d at 91-93.

```
 1              employer's client by a voluntary seller of
 2              that client's good will constitutes improper
 3              solicitation?  We are particularly interested
 4              in how the following two sets of
 5              circumstances influence this analysis: (1)
 6              the active development and participation by
 7              the seller, in response to inquiries from a
 8              former client whose good will the seller has
 9              voluntarily sold to a third party, in a plan
10              whereby others at the seller's new company
11              solicit the client, and (2) participation by
12              the seller in solicitation meetings where the
13              seller's role is largely passive.
```

14  Id. at 94.

15                    The New York Court of Appeals's
16                    Answer to Our Certified Question

17          The New York Court of Appeals accepted and answered our

18  certified question.  It noted that, "[u]nder New York common law,

19  a seller has an 'implied covenant' or 'duty to refrain from

20  soliciting former customers, which arises upon the sale of the

21  'good will' of an established business.'"  Bessemer V, 16 N.Y.3d

22  at 556, 949 N.E.2d at 468, 925 N.Y.S.2d at 377 (quoting Mohawk

23  Maintenance Co., 52 N.Y.2d at 283, 419 N.E.2d at 328, 437

24  N.Y.S.2d at 650).  This covenant, which is effective in

25  perpetuity, is based on the principle that "the vendor is not at

26  liberty to destroy or depreciate the thing which he has sold;

27  there is an implied covenant, on the sale of [']good will['],

28  that the vendor does not solicit the custom which he has parted

29  with; it would be a fraud on the contract to do so."  Id.

30  (quoting Von Bremen v. MacMonnies, 200 N.Y. 41, 50-51, 93 N.E.

31  186, 189 (1910)).  Thus, the seller of "good will" may not

1   "actively solicit" the customers associated with it.  Id. at 557,

2   949 N.E.2d at 468, 925 N.Y.S.2d at 377.

3          Despite these general principles, a buyer of "good

4   will" assumes "certain risks" relating to the continuation of the

5   purchased business.  Id.  Unless the buyer has also secured from

6   the seller of "good will" a binding promise not to compete, the

7   buyer risks loss of customers to him or her.  Id.

8          Rather than creating a "hard and fast rule [to]

9   determin[e] whether a seller of 'good will' has improperly

10  solicited his former clients" in response to our certified

11  question, the Court of Appeals instructed that "in making this

12  assessment on a case-by-case basis, the trier of fact must

13  consider the principles underlying the rule in Mohawk and the

14  factors involved within the relevant industry that may impair the

15  'good will' conveyed by the original seller."  Id. at 557, 949

16  N.E.2d at 469, 925 N.Y.S.2d at 378.

17         Among the factors to be considered in this inquiry are

18  whether the seller initiated contact with his or her former

19  clients associated with the sold "good will."  "The 'implied

20  covenant' not to solicit former customers bars a seller from

21  taking affirmative steps to directly communicate with them," such

22  as by "send[ing] targeted mailings or mak[ing] individualized

23  telephone calls to his former customers informing them of his new

10

1   business ventures."[4]  Id. at 557-58, 949 N.E.2d at 469, 925

2   N.Y.S.2d at 378.

3          The Court of Appeals explained that while a seller "is

4   not free to tout his new business venture simply because a former

5   client has fortuitously communicated with him first," he is

6   allowed to make certain responses to questioning initiated by the

7   former client.  Id.  The seller "may answer the factual inquiries

8   of a former client, so long as such responses do not go beyond

9   the scope of the specific information sought."  Id. at 558-59,

10  949 N.E.2d at 469-70, 925 N.Y.S.2d at 378-79.  And "even if

11  prompted," he may not "disparage[] the purchaser of his

12  business."  Id. at 559, 949 N.E.2d at 470, 925 N.Y.S.2d at 379.

13  Nor may he "explain . . . why he believes his products or

14  services are superior" in response to a question from a former

15  client.  Id.

16         When the seller of "good will" subsequently joins a

17  firm that competes with the buyer, he may "convey certain

18  information about his former client to his new employer,"

19  including "a former client's investment preferences, financial

20  goals, and tolerance of risk."  Id.  However, the seller may not

21  convey to his new employer "information that is proprietary to a

22  purchaser of 'good will.'"  Id.  Should the former client request

23  a "sales pitch" meeting, as the Palmer family did, the seller may

_____

    [4] The Court of Appeals made clear that the examples of
impermissible conduct just discussed are intended to be
"illustrative, not exhaustive."  Id.

1    help his new employer prepare for the meeting and "may be present
2    when such meeting takes place, . . . [s]o long as [his] role is
3    limited to responses to factual matters." Id.

4           In sum, the Court of Appeals concluded, "while a
5    seller may not contact his former clients directly, he may, 'in
6    response to inquiries' made on a former client's own initiative,
7    answer factual questions[,] . . . [and] assist his new employer
8    in the 'active development . . . [of] a plan' to respond to that
9    client's inquiries.  Should that plan result in a meeting with a
10   client, a seller's 'largely passive' role at such meeting . . .
11   [is permissible]." Id. at 559-60, 949 N.E.2d at 470, 925
12   N.Y.S.2d at 379 (second ellipsis in original; some alterations in
13   original).

14                           **DISCUSSION**

15          "In reviewing a district court's decision in a bench
16   trial, we review the district court's findings of fact for clear
17   error and its conclusions of law de novo." White v. White Rose
18   Food, 237 F.3d 174, 178 (2d Cir. 2001).  Having reviewed the
19   legal standard applied by the district court and the facts it
20   emphasized in applying it, with the benefit of the Court of
21   Appeals's answer to our certified question, we conclude that the
22   district court's judgment as to Branin's liability must be
23   vacated.

24          First, the district court placed considerable weight on
25   the fact that Branin intended to transfer his former clients to
26   Stein Roe.  It also emphasized the fact that Branin's employment

1    with Stein Roe was consummated with the understanding that he

2    would seek to take his Bessemer clients with him to Stein Roe.

3    See Bessemer I, 427 F. Supp. 2d at 393 ("In addition to Branin's

4    stated intent to transfer his clients, the 'lift-out template'

5    which marked his move to Stein Roe was completely dependent upon

6    him successfully transferring clients from Bessemer to Stein

7    Roe.").  While these facts may provide useful background for

8    evaluating the propriety of Branin's actions, the New York Court

9    of Appeals has made it clear that an intent to secure the

10   business of former clients associated with sold "good will" is

11   not ipso facto improper.  "[P]rovided that he does not actively

12   solicit" his former customers, Bessemer V, 16 N.Y.3d at 557, 949

13   N.E.2d at 468, 925 N.Y.S.2d at 377 (emphasis omitted), a seller

14   of "good will" may "assist his new employer in the active

15   development of a plan to respond to" former clients' inquiries,

16   id. at 560, 949 N.E.2d at 470, 925 N.Y.S.2d at 379 (brackets,

17   internal quotation marks, and ellipsis omitted).  Those very

18   actions were an important part of Branin and Stein Roe's plan to

19   persuade Bessemer clients associated with the sold "good will" to

20   bring their business to Stein Roe.

21          The district court, in making its determination, relied

22   significantly on various actions taken by Branin to make Stein

23   Roe attractive to former clients and ease their transition to the

24   firm, but which were not in the nature of active solicitation.

25   These measures included Branin's hiring of his former secretary

26   to assist him in transferring clients, Bessemer I, 427 F. Supp.

13

1   2d at 394 ("Branin pushed for the hiring of [the former

2   secretary], and willingly absorbed over half of her compensation,

3   as a way to help him transition clients and to frustrate

4   Bessemer's use of someone who was acquainted with approximately

5   70% of his clients."), and Branin's retention of his fee schedule

6   from Bessemer, id. ("[H]aving the same fees as at Bessemer would

7   facilitate the movement of clients to Stein Roe.").  While this

8   conduct may evidence an intent to transfer clients, it is clear

9   from the Court of Appeals's opinion that harboring such an

10  intent, and even taking some action in furtherance of that

11  intent, does not necessarily constitute legally impermissible

12  affirmative solicitation.

13          The district court also focused on Branin's stock

14  response to former clients, including Carleton Palmer, who called

15  and asked Branin why he moved from Bessemer to Stein Roe.  See

16  id. at 396 n.10.  The court found that Branin's response, which

17  was that "Stein Roe 'was far more appropriate for me' and for 'my

18  training and experience of 30 years in the business,'" was

19  "disingenuous and improper."  Id. at 394 (citation omitted).

20  Whether Branin's response was factual in nature or instead the

21  equivalent of "tout[ing] his new business venture simply because

22  a former client has fortuitously communicated with him first,"

23  "disparag[ing]" Bessemer, or explaining "why he believe[d] his

24  products or services [were] superior" to Bessemer's, Bessemer V,

25  16 N.Y.3d at 558-59, 949 N.E.2d at 469-70, 925 N.Y.S.2d at 378-

14

1   79, should be considered by the district court in the first

2   instance in light of the New York Court of Appeals's views.

3           The district court also appeared to place great weight

4   on the fact that Branin helped Stein Roe to organize a "dog and

5   pony" show to entice Palmer to move his business -- "a

6   presentation which" the district court described as "perfectly

7   tailored to [Palmer's] liking by [Branin]." Bessemer I, 427 F.

8   Supp. 2d. at 397.  "Armed with information about Palmer that

9   Branin had gathered from years of working with him, Stein Roe's

10   presenters steered clear of topics in which Palmer had little

11   interest and focused only on those things that were of interest

12   to him." Id. at 396 (citations omitted).  And as the district

13   court pointed out, this gave Stein Roe a significant advantage

14   over Bessemer when it made a similar presentation to Palmer.  Id.

15           But the Court of Appeals has now made clear that at

16   least some tailoring of presentations to former clients of a

17   seller of "good will" such as Branin is permitted.  Such a person

18   "is free to convey certain information about his former client to

19   his new employer," including "a former client's investment

20   preferences, financial goals, and tolerance of risk." Bessemer

21   V, 16 N.Y.3d at 559, 949 N.E.2d at 470, 925 N.Y.S.2d at 379.  The

22   Court of Appeals also noted that such a seller of "good will"

23   "may also aid his new employer in preparing for a 'sales pitch'

24   meeting requested by a former client." Id.  Indeed, he may

25   "assist his new employer in the active development of a plan to

26   respond to that client's inquiries." Id. at 560, 949 N.E.2d at

1    470, 925 N.Y.S.2d at 379 (brackets, internal quotation marks, and

2    ellipsis omitted).

3          Similarly, the district court found it "significant[]"

4    that, although Palmer described Branin's role in the "dog and

5    pony" show as "minor," Palmer testified that "Branin

6    'occasionally amplif[ied] a point if he knew it was something I

7    would be interested in from his relationship with me." Bessemer

8    I, 427 F. Supp. 2d at 396 (citation omitted).  The Court of

9    Appeals said explicitly that a seller of "good will" "may be

10   present when such [a] meeting takes place." Bessemer V, 16

11   N.Y.3d at 559, 949 N.E.2d at 470, 925 N.Y.S.2d at 379.  On

12   remand, the court should therefore consider whether Branin's

13   "role" at the sale presentation was "limited to responses to

14   factual matters," id., and thus permissible.  The court should

15   also make this determination with respect to Branin's subsequent

16   meeting with Carleton Palmer in Ohio, during which Branin

17   "informed Palmer that he would pay the same fees as at Bessemer,"

18   and that William Rankin, "the Chief Executive Officer of Stein

19   Roe and a man with whom Palmer was 'very impressed,' [would be

20   the] 'number two' on the Palmer account" if he moved to Stein

21   Roe. Bessemer I, 427 F. Supp. 2d at 396 (citation omitted).

22         Finally, the district court rejected Branin's argument

23   that "he cannot be found to have acted improperly because he was

24   simply responding to his clients."  427 F. Supp. 2d at 396 n.10.

25   The court thought this argument "unpersuasive and not supported

26   by New York law" because the leading cases "place no significance

16

1    on who initiates the communications between the seller of [']good

2    will['] and his now-former clients."  Id. (emphasis added).  But,

3    in answering our certified question, the Court of Appeals

4    explained to the contrary that "[a] trier of fact ought to

5    consider whether, following the sale of a business and its

6    [']good will,['] a seller initiated contact with his former

7    customers or clients.  Such initiation is particularly relevant

8    where a seller, like Branin, remains in the industry."  Bessemer

9    V, 16 N.Y.3d at 557, 949 N.E.2d at 469, 925 N.Y.S.2d at 378.

10   (emphases added).

11           We conclude, with the benefit of the Court of Appeals's

12   additional guidance (which was, of course, unavailable to the

13   district court at the time it was considering this case), that

14   the court's understanding of New York law was clearly in error.

15   We must therefore vacate the judgment of the district court,

16   insofar as it reflects the court's finding of liability against

17   Branin, and remand the matter to the district court for it to

18   apply New York law in accordance with the legal precepts set

19   forth in the New York Court of Appeals' answer to our certified

20   question and, of course, with the opinions of this Court.

21           "We express no view on how the district court should

22   resolve the matter . . . .  We merely conclude that, in light of

23   the rulings of the New York Court of Appeals on the certified

24   questions, the district court's [judgment] . . . can no longer

25   stand."  Commodity Futures Trading Comm'n v. Walsh, 658 F.3d 194,

26   199-200 (2d Cir. 2011).  It will be for the district court in the

17

1    first instance on remand to decide whether this case in its

2    current posture is best suited for summary judgment practice or

3    for trial.  Should this matter come before this Court again, we

4    will review the district court's decision under the ordinarily

5    applicable standards of deference.

6          In our prior opinion, we "reserve[d] decision on the

7    correct method for the calculation of damages" pending the New

8    York Court of Appeals answer to our certified question.  Bessemer

9    IV, 618 F.3d at 91.  Because we determine that the district

10   court's finding of liability must be vacated and the case

11   remanded for further proceedings, we again reserve decision on

12   the issue of damages.  We will consider the issue, if necessary,

13   if the district court finds Branin liable on Bessemer's claim and

14   the case is brought before us on appeal.

15                              **CONCLUSION**

16          For the foregoing reasons, we vacate the district

17   court's judgment insofar as it found Branin liable to Bessemer,

18   and we remand to that court for further proceedings consistent

19   with this opinion and the New York Court of Appeals's opinion

20   answering our certified question.  Any further appeal to this

21   Court in this case shall be assigned by the Clerk of Court to a

22   new panel (whether or not including one or more members of the

23   current panel) in the ordinary course.

24          Each party shall bear its or his own costs on appeal.

**A True Copy**

Catherine O'Hagan Wolfe  Clerk

United States Court of Appeals, Second Circuit

18